**AFFIRM; and Opinion Filed August 6, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00681-CV

**RAUL NANEZ RAMIREZ, Appellant**
**V.**
**EZRA CLIFTON WELCH, Appellee**

**On Appeal from the 44th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-01851**

# MEMORANDUM OPINION

Before Justices Francis, Myers, and Whitehill
Opinion by Justice Whitehill

This is a personal-injury case. Plaintiff–appellant Raul Nanez Ramirez alleged that his neighbor, defendant–appellee Ezra Clifton Welch, negligently struck him in the head and caused him serious injuries. The jury found that both men's negligence caused the altercation; Welch was sixty percent responsible for the altercation; but Ramirez suffered no resulting damages. The trial court rendered a take-nothing judgment based on the jury's verdict and denied Ramirez's new trial motion.

Ramirez appeals, raising five issues. We overrule them all and affirm.

I. BACKGROUND

**A.** **Factual Background**

The following facts are based on the trial evidence:

Ramirez and Welch became next-door neighbors in 1991. Their relationship soured over time.

Ramirez testified that he had a confrontation with Welch shortly after noon on September 8, 2013. According to Ramirez, he was inside his house when he heard some noise outside. He went outside and encountered Welch between their houses. The two men exchanged a few words, and when Ramirez reached down to pick up a trash can that had fallen over or been knocked down, Welch "hit [Ramirez] hard." Ramirez elaborated that Welch "sucker-punched" him on the left side of the head above the ear, hitting him so hard it broke his glasses.

A week or two after the incident, Ramirez started to have headaches, problems with his balance, and other health problems. On November 24, 2013, approximately eleven weeks after the incident, he went to an emergency room and was diagnosed with a subdural hematoma. He underwent surgery the next day.

Ramirez's treating physician, Dr. Christopher Michael, testified by video deposition that "a subdural hematoma is a hemorrhage that occurs underneath the dural membrane, which is the membrane that surrounds the brain and holds the cerebral spinal fluid in. And the subdural hemorrhage collects between that membrane and the brain surface." Michael further testified that Ramirez's hematoma was caused by the blow to the head that Ramirez reported suffering on September 8.

Welch testified and described the September 8th incident very differently. According to him, he was outside, tripped over a tree limb, and fell backwards into Ramirez's trash cans. Then Ramirez came out of his house, and the men exchanged a few words. Welch complained to

Ramirez that he had "trash[ed]" Welch's yard by blowing lawn debris from Ramirez's yard onto Welch's. Ramirez grabbed some nearby branches and began shaking them in Welch's face. Welch stepped back and threw his hands up, apparently to ward off the branches. When he threw his hands up, his "right little pinkie finger hit [Ramirez] on his right chin bone." Welch said he made no other physical contact with Ramirez that day.

Welch also called an expert witness, Dr. Louis Whitworth, by video deposition. Whitworth opined that (i) it was not medically probable that the September 8th incident caused Ramirez's hematoma and (ii) it was medically probable that the hematoma was only two to six weeks old when Ramirez went to the emergency room in late November 2013.

## B.    Procedural History

Ramirez sued Welch for negligence. A jury found that both men's negligence proximately caused "the occurrence in question," which the jury charge defined as "the altercation that occurred on September 8, 2013."[1] The jury found Ramirez forty percent responsible for causing the altercation and Welch sixty percent responsible. Finally, the jury was asked to find the sum of money that would fairly and reasonably compensate Ramirez "for his injuries, if any[,] that resulted from the occurrence in question." The damages categories included both past and future damages. The jury answered zero to every damages category.

The trial court rendered a take-nothing judgment on the jury verdict.

Ramirez timely filed a new trial motion that was overruled by operation of law, and Ramirez timely appealed.

## II.  ISSUES PRESENTED

Ramirez raises five issues:

---

[1] Ramirez does not argue that this question was improper, and we express no opinion in that regard.

1. The trial court erred by admitting Whitworth's testimony because Welch failed to properly disclose Whitworth in discovery.

2. The trial court erred by admitting Whitworth's testimony because his opinions were unreliable and conclusory.

3. The trial court committed jury charge error.

4. Welch's lawyer made an improper and incurable closing argument.

5. The trial court erred by excluding some of Michael's causation testimony.

We overrule Ramirez's issues for the reasons discussed below.

### III. ANALYSIS

**A. First Issue: Did the trial court err by allowing Whitworth to testify over Ramirez's Rule 193.6 objection?**

Ramirez first argues that the trial court erred by overruling his motion to exclude Whitworth's testimony because Welch did not (i) properly and timely designate him as an expert witness or (ii) show either good cause for the improper disclosure or a lack of unfair surprise or unfair prejudice to Ramirez. *See generally* TEX. R. CIV. P. 193.6. We conclude that the trial court did not abuse its discretion because it could reasonably have concluded that (i) Ramirez did not carry his burden to show that the Whitworth disclosure was improper and, alternatively, (ii) Ramirez was not unfairly surprised or unfairly prejudiced by the alleged discovery violations.

#### 1. Standard of Review

The standard of review is abuse of discretion. *Lopez v. La Madeleine of Tex., Inc.*, 200 S.W.3d 854, 859–60 (Tex. App.—Dallas 2006, no pet.). A trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision. *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 719 (Tex. App.—Dallas 2011, pet. denied).

#### 2. Applicable Law

Parties can compel each other to designate testifying experts by serving a request for disclosure that seeks the information listed in Rule 194.2(f). *See* TEX. R. CIV. P. 194.2(f), 195.1.

If a testifying expert is subject to a party's control, the party must disclose, among other things, the expert's resume, bibliography, and "all documents, tangible things, reports, models, or data compilations that have been provided to, *reviewed by*, or prepared by or for the expert in anticipation of the expert's testimony." *Id*. 194.2(f)(4) (emphasis added).

Rule 195 governs the deadline to make a Rule 194.2(f) expert disclosure. *See id*. 194.3(b). A party must comply with a Rule 194.2(f) request for disclosure by the later of (i) thirty days after the disclosure request was served or (ii) sixty or ninety days before the end of the discovery period, depending on whether the expert is testifying for a party seeking affirmative relief. *Id*. 195.2. But Rule 195.2 further provides that the trial court has the power to change these deadlines. *See id*. (stating that the deadlines apply "[u]nless otherwise ordered by the court").

Rule 193 provides that "[a] party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified." *Id*. 193.6(a).

But a party can avoid this sanction if the court finds that (i) there was good cause for the failure or (ii) the failure "will not unfairly surprise or unfairly prejudice the other parties." *Id*. 193.6(a)(1)–(2).

Rule 193.6's purposes are to promote responsible assessment of settlement and prevent trial by ambush. *TierOne Converged Networks, Inc. v. Parman*, No. 05-12-00026-CV, 2013 WL 3477346, at *3 (Tex. App.—Dallas July 9, 2013, pet. denied) (mem. op.).

### 3.    Relevant Facts

Ramirez made a request for disclosure encompassing all subparts of Rule 194.2, so Welch was required to fully designate testifying experts pursuant to Rule 194.2(f).

The trial court's scheduling order set the case for trial on May 25, 2015, and established Welch's expert designation deadline as 120 days before trial. However, the trial was reset for early December 2015.

On December 4, 2015, Welch moved to exclude or limit expert testimony from Michael. Welch argued that Michael was in fact a retained expert, which Ramirez denied, and that Ramirez had failed to properly disclose Michael as such.

At a pretrial conference, the trial judge gave Ramirez a choice between proceeding to trial under an order limiting Michael's testimony to his medical records or accepting a continuance to allow Michael to be deposed. Ramirez opted for the continuance. The court then ordered that (i) Welch's deadline to designate a rebuttal expert was January 29, 2016, (ii) Ramirez would be allowed to depose Welch's expert on or before February 5, and (iii) the trial would begin February 16. But the trial judge did not at that time rule that she would allow Michael to testify to expert opinions beyond any that were reflected in Ramirez's medical records that Michael created.

Welch asserts, and Ramirez does not dispute, that (i) Welch designated Whitworth as a testifying expert on January 28, 2016, and (ii) Ramirez deposed Whitworth on February 5th.

On February 10, Ramirez filed a motion to exclude Whitworth's testimony, asserting that Welch failed to produce "all" documents provided to or reviewed by Whitworth.

Welch responded and moved to exclude Michael's testimony.

On the first day of trial, before voir dire, the trial court took up the motions to exclude. The judge ruled that (i) Michael would be limited to testifying about his observations and treatment and (ii) Whitworth's testimony would be excluded.

At the beginning of the trial's second day, the trial judge changed her ruling as to Michael and allowed him to also give causation opinions. Welch then asked the judge to reconsider Whitworth's exclusion, but she declined. Some of Michael's deposition was played for the jury.

During that deposition testimony, Michael opined that the blow Ramirez received from Welch eleven weeks before Ramirez presented at the emergency room proximately caused Ramirez's injuries. At the end of the day, Welch again asked the court to reconsider allowing Welch to call Whitworth regarding the causation issue. The judge said she would take the issue up the next morning after she read the deposition testimony.

At the beginning of the trial's third and final day, the trial judge changed her ruling as to Whitworth and allowed him to testify. Whitworth's video deposition was played for the jury later that day. Relying in large part on information in Ramirez's medical records and computerized measurements taken from Ramirez's CT scans, Whitworth opined that in medical probability Welch's blow to Ramirez did not cause his injuries.

### 4. Applying the Law to the Facts

Ramirez's issue presents the following questions: (i) Did Welch fail to properly disclose Whitworth, thereby triggering automatic exclusion under Rule 193.6, and (ii) if so, did Welch establish an exception to the rule requiring exclusion?

#### a. Did Welch fail to properly disclose Whitworth?

For the following reasons, we reject Ramirez's argument that the trial court abused its discretion by allowing Whitworth to testify because the trial could have reasonably concluded that (i) Ramirez did not prove a violation or (ii) if there was a violation, Welch established that Ramirez did not suffer any resulting unfair prejudice. [2]

To begin, the trial court could have reasonably determined that Ramirez did not carry his burden to prove that Welch's January 28th expert designation failed to satisfy Welch's Rule 194.2(f)(4)(A) duties regarding materials that the retained expert (i) relied on when forming his

---

[2] Although Ramirez objected to the trial court's order extending Welch's disclosure deadline to January 29 and asserts in his brief that he "respectfully maintains" that objection, he presents no appellate issue or argument challenging that order.

opinions and (ii) reviewed in anticipation of his testimony. It is undisputed that Welch timely served his expert designation by the trial court's deadline. But that designation is not in the record, and we thus cannot review its content to determine its adequacy. Indeed, the record does not indicate that the designation was ever shown to the trial court.

Moreover, although Ramirez's motion to exclude Whitworth (filed after Ramirez deposed Whitworth) broadly alleges that Welch failed to disclose "any of the material that [Whitworth] reviewed to form his opinions, such as scientific articles that were relied upon," Welch's response to that motion stated equally broadly that "Plaintiff's assertion that 'all information reviewed was not produced' is incorrect as all information reviewed by Dr. Whitworth was timely produced as mandated by the Court and reproduced a second time at the time of Dr. Whitworth's deposition." Welch's response also attached as exhibits copies of (i) a disputed September 22, 2015 transmittal letter from Welch's counsel to Whitworth, (ii) a copy of the chapters of the text book on which Whitworth relied, and (iii) a copy of an article titled "Chronic Subdural Hematoma in the Elderly" that Whitworth used as a reference.[3] That response further stated that "[w]ith regard to the Hounsfield Unit grading system, Dr. Whitworth relied on the OSIRIX radiology viewing program and referenced the website www.radiopaedia.org."

Furthermore, Ramirez's motion did not specifically assert that the website was not disclosed in the designation.[4]

---

[3] It is well settled that "[d]ocuments attached to pleadings are not evidence unless they are offered and admitted as evidence by the trial court." *Ugwa v. Ugwa*, No. 05-17-00633-CV, 2018 WL 2715437, at *2 (Tex. App—Dallas June 6, 2018, no pet. h.) (mem. op.). Here, however, neither party complained in the trial court or on appeal that the motion and the response were not sworn to or accompanied by supporting affidavits. And counsel for both parties made similar, unobjected to statements during trial when they argued Ramirez's motion to exclude Whitworth. So we see no harm to the extent, if any, that the trial court credited the motion and response as evidence for the filing party. *See Gibbs v. Bureaus Inv. Grp. Portfolio No. 14, LLC*, 441 S.W.3d 764, 766–67 & n.4 (Tex. App.—El Paso 2014, no pet.) (relying on "the discussion at trial" for the facts pertinent to a Rule 193.6 issue). However, the better practice would have been to offer evidence of their factual recitations at the hearing for admission into evidence. Furthermore, it was Ramirez's burden to prove that Welch did not make proper disclosures; it was not Welch's burden to prove the opposite.

[4] While Whitworth agreed at his deposition that his report did not mention the website, the record does not reveal whether Welch's January 28th disclosure did so.

Thus the written motion practice did little to resolve the issue.[5] The lack of attention to the website in the motion practice (which occurred after Whitworth's deposition), however, suggests that the parties did not consider the disclosure of materials on the website that Whitworth might have reviewed but did not rely on to be a material concern at that time.

Additionally, the trial court could have reasonably concluded from Ramirez's motion to strike that Ramirez would have accepted as compliant production of required information at Whitworth's deposition. Specifically, Ramirez's motion said that he gave Welch the opportunity to comply by subpoenaing non-disclosed information at Whitworth's deposition but that Welch still did not produce all of the information that Whitworth had reviewed. But the record shows that Ramirez's counsel and Whitworth called up and discussed the website during Whitworth's deposition. Ramirez's counsel was there and apparently had ample time and opportunity to question Whitworth further on that topic but did not do so. At least the record does not contain a complaint that Ramirez could not follow up due to time constraints.

Next, arguments during trial regarding Whitworth's designation were not much more enlightening. The discussion pertinent to Welch's alleged failure to disclose comprises (i) the lawyers' arguments on February 16[6] and (ii) Whitworth's deposition testimony.

First, Ramirez's lawyer said the following:

. . . I didn't get, I think until yesterday, the rest of the correspondence that had been actually sent to [Whitworth].

Prior to [Whitworth's] deposition, I had not been provided any of the articles, the scientific articles that he had relied on to provide his opinions. And I still haven't been provided the information from websites that he looked at but didn't rely upon.

---

[5] Ramirez does not argue that simply identifying the website as a reviewed document would have been insufficient compliance with Rule 193.6. Therefore, we do not decide that issue. To the extent that Ramirez complains about Whitworth's not identifying documents that he reviewed but did not rely on, Rule 194.2(f)(4)(A) does not require a designating party to distinguish between reviewed documents that the expert relied on and reviewed documents that the expert did not rely on.

[6] Although the lawyers were not placed under oath, neither side objected, and they were attempting to prove factual matters of which they had personal knowledge, so we consider their statements as evidence. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997) (per curiam).

. . . .

And I took his deposition. I issued a subpoena, and he didn't give any of the documents that he looked at on the website other than one specific link. He said, That's as much as I'm going to tell you. And that's the one that he relied upon.

But what I don't have is the ones which he didn't rely upon, which are probably the best pages for my side of the case.

Second, Welch's lawyer responded thusly:

Now, the one document that we failed to disclose—and it was inadvertent—it is this document right here. And [Ramirez's attorney] was provided with it this week. As soon as I was able to track it down in my files, I gave it to him.

It is a cover letter sending a form of payment to the expert. He was able to cross-examine the expert about how much he received. He got a copy of the check from the expert.

At his deposition we—well, first of all, before the deposition, at the time we retained[7] the expert, we sent [Ramirez's attorney] everything that we had from the expert and everything we sent to the expert with the exception of that one letter.

. . . .

Now there was talk about the website. The website was Radiopedia.org. The expert went ahead and read the link to [Ramirez's attorney] on the record, so there is a copy—so [Ramirez's attorney] could go look at that, and he got an opportunity to review it. And he also got an opportunity to cross-examine the expert on that article.

And then he said he should be—he should have access to everything that the expert didn't rely on. Well, that's the infinite universe. Our obligation is to provide him with what the expert relied on. The expert did that. He provided him everything that he did rely on.

In his deposition, Whitworth said the following:

Q: You didn't produce the documents from the web page in response to the subpoena, did you, Doctor?"

A: I don't know the legal meaning of document. I assumed, by stating that I used this website as a reference source, that would be sufficient.

. . . .

---

[7] Although Welch's lawyer said "retained," the context suggests that he meant "designated," because elsewhere he acknowledged that he had hired Whitworth as a consulting expert in September 2015.

Q:      Did you *look at* any other articles on the Radiopaedia.com website other than the one that you pulled up on [Welch's lawyer's] computer?

A:      I'm sure I have *looked at* many.

Q:      Okay. Can we find the other ones that you have relied upon in this case, if there are any?

A:      We—I mean, I have given you the website. You can play around with it. That's about how I do it.

Q:      Did you *look at* other articles besides the one that you pulled up on [Welch's lawyer's] computer, and did you rely upon them when forming any opinions in this case?

A:      Yes. And no to the second half.

Q:      Okay. Please explain your answer.

A:      Did I *look at* any other articles? Yes.

Q:      Okay.

A:      Did I rely on them for formulating my opinions? No. [8]

(Emphases added.) The record, however, does not reflect how many other articles he looked at, what their subject matter was, or why he did not rely on them. [9]

Based on this record, we cannot conclude that the trial judge abused her discretion by determining that Ramirez did not carry his burden to prove that Welch failed to adequately designate Whitworth, if that was the basis for changing her prior rulings regarding Whitworth. Regardless, as discussed in the next section, we alternatively conclude that the trial court nonetheless could have also reasonably determined that Ramirez did not suffer any unfair surprise or unfair prejudice by overruling Ramirez's objection to Whitworth's testifying.

---

[8] Although this deposition testimony was not placed in the record until after the trial judge changed her ruling on admitting Whitworth's testimony, she said on the record that she would read Whitworth's deposition designations that night before ruling the next morning on Welch's request that she reconsider prior decisions to exclude that testimony.

[9] Neither party addresses whether there is a difference between "reviewing" documents on a website versus "looking at" them. For purposes of this opinion, we assume that the verbs are equivalent.

### b. Did Welch establish an exception to the rule requiring exclusion?

Next, Ramirez argues that Welch did not prove an exception to the rule requiring exclusion. However, we conclude that the trial court could reasonably have found that the asserted disclosure violations did not unfairly surprise or unfairly prejudice Ramirez. *See* TEX. R. CIV. P. 193.6(a)(2).

Assuming the trial judge determined that Welch did not adequately disclose certain information, Welch had to prove an exception to the rule requiring exclusion. *See* TEX. R. CIV. P. 193.6(b). A finding that an exception applies must be supported by the record. *Id.*

As to the late disclosed cover letter, Ramirez argues that he was prejudiced because he couldn't ask Whitworth at his deposition when he was hired. But Ramirez's attorney did ask Whitworth when he was initially contacted in this case, and he answered that it was approximately September or October 2015, which was consistent with what the letter said. Ramirez does not explain how late disclosure of the cover letter harmed his case. We therefore conclude that the trial court could reasonably find that no unfair surprise or unfair prejudice resulted from this late disclosure.

Next, Ramirez argues that he was unfairly surprised and prejudiced because he could not properly prepare for Whitworth's deposition without having in advance both the articles Whitworth relied on and the information that Whitworth reviewed but did not rely on in forming his opinions. Welch says that any untimely disclosure of the articles Whitworth relied on was not unfairly prejudicial because Ramirez got the articles Whitworth relied on at Whitworth's deposition and had the opportunity to examine him about the articles then.

We find no abuse of discretion. Consistent with Welch's prior representations to the trial court that Welch included with the January 28th designation the articles that Whitworth relied on, Welch's counsel made similar representations to the court without objection when the issue arose again during trial. The record supports that (i) Ramirez was willing to accept the articles at the

deposition as acceptable; (ii) Ramirez's counsel received and questioned Whitworth about scientific articles at Whitworth's deposition; and (iii) those were the articles and chapter that Whitworth said he relied on in forming his opinions.

The record further shows that before his deposition Whitworth "looked at" some online information at a website called "Radiopaedia.org." Whitworth's testimony indicates that during the deposition he "pulled up" some articles on Welch's lawyer's computer so that Ramirez's lawyer could see them.

Although Whitworth did not specifically identify the online articles that he looked at but did not rely on, he provided Ramirez with the website and said that he could "play around with it," which is essentially what Whitworth did. Moreover, the record does not indicate that Ramirez's counsel was pressed for time to further explore the website with Whitworth had he felt a need to do so. Thus, the trial court could reasonably have concluded that although Welch did not timely disclose all the materials Whitworth had looked at, he adequately disclosed them at Whitworth's deposition, where Ramirez could have questioned Whitworth about them, and this negated any unfair surprise or unfair prejudice to Ramirez.

In the further alternative, the trial court could have reasonably concluded that Welch sustained his burden of establishing no unfair prejudice under the unique circumstances presented in this case. Specifically, the record indicated that the case would turn on whether Welch's contact with Ramirez's head caused Ramirez's subdural hematoma. Thus, from the outset causation was a critical issue and medical testimony would be needed to establish that Ramirez's injuries presented eleven weeks later were caused by that blow. Yet, it was not until shortly before trial was to begin and Welch moved to preclude Michael from providing causation testimony beyond anything to that effect in Ramirez's medical records that Ramirez disclosed his intent to use Michael for that purpose.

The trial judge gave Welch a rushed opportunity to designate a rebuttal causation expert. Although the record is not clear, as discussed above, there was a basis from which the trial judge could have reasonably concluded that (i) Welch timely disclosed the materials that Whitworth relied on; (ii) the untimely cover letter to Whitworth was inconsequential; and (iii) Ramirez did not suffer any unfair prejudice concerning articles on the radiopaedia.com website that Whitworth "looked at" in connection with this case but did not rely on. Regarding the website, that issue received scant attention in the motion practice; Ramirez's counsel does not appear to have been time-pressed from following up on this topic at the deposition; and there is no indication that there were any other articles on that website that could or would have been helpful to Ramirez.

A trial court does not abuse its discretion if some evidence supports its decision. *PopCap Games*, 350 S.W.3d at 719. We conclude that there is some evidence supporting the trial court's implicit finding that Welch's discovery violations did not unfairly surprise or unfairly prejudice Ramirez, if that is how the trial court decided this case. Thus, even if Welch's disclosures were inadequate, the trial court did not abuse its discretion by overruling Ramirez's Rule 193.6 objection and motion to exclude. Accordingly, we overrule Ramirez's first issue.

**B.      Second Issue:  Did the trial court err by admitting Whitworth's testimony because it was conclusory or unreliable?**

Ramirez's second issue argues that the trial court erred by overruling his motion to exclude Whitworth based on unreliability and other grounds. We conclude that the trial court did not abuse its discretion.

### 1.      Standard of Review

Admissibility rulings, including rulings on an expert's reliability, are reviewed for abuse of discretion. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). A trial court abuses its discretion if it admits expert testimony that does not meet the reliability requirement. *Id*.

–14–

## 2.      Applicable Law

Ramirez's arguments focus on three legal principles.

First, Ramirez argues that Whitworth's opinions are conclusory.  A conclusory opinion is not competent evidence.  *United Servs. Auto. Ass'n v. Croft*, 175 S.W.3d 457, 464 (Tex. App.—Dallas 2005, no pet.).  An expert opinion is conclusory if it lacks factual substantiation.  *Id*. at 463. In other words, the expert must state a demonstrable and reasoned basis on which the opinion can be evaluated.  *Starwood Mgmt., LLC ex rel. Gonzalez v. Swaim*, 530 S.W.3d 673, 679 (Tex. 2017) (per curiam).  If no basis for the opinion is offered, or the offered basis provides no support, the opinion is conclusory and cannot be considered probative evidence, even if there is no objection. *Gunn v. McCoy*, No. 16-0125, 2018 WL 2994534, at *8 (Tex. June 15, 2018).

Second, Ramirez argues that Whitworth's testimony is unreliable.  Scientific expert testimony must be shown to be reliable.  *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 722 (Tex. 1998); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995).  Relevant factors in a reliability determination include:

1.      the extent to which the theory has been or can be tested;

2.      the extent to which the technique relies on the expert's subjective interpretation;

3.      whether the theory has been subjected to peer review or publication;

4.      the technique's potential rate of error;

5.      whether the relevant scientific community has generally accepted the underlying theory or technique as valid; and

6.      the non-judicial uses that have been made of the theory or technique.

*See Robinson*, 923 S.W.2d at 557.  But not every factor applies to every instance of expert testimony.  *See Gammill*, 972 S.W.2d at 726.  Sometimes the witness's skill and experience alone may provide a sufficient basis for the opinion.  *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 905 (Tex. 2004).  But there must still be some basis to establish the opinion's reliability.  *Id*.

–15–

The offering party bears the burden of demonstrating that the expert's opinion is reliable. *Twin City Fire Ins. Co. v. Vega-Garcia*, 223 S.W.3d 762, 770 (Tex. App.—Dallas 2007, pet. denied).

Third, Ramirez argues that Whitworth's opinions suffer from a fatal analytical gap because he could not exclude the September 8, 2013 incident as a possible cause of Ramirez's hematoma. By this, we understand him to invoke the principle that "when the evidence demonstrates that there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty." *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017) (internal quotations, emphasis, and citation omitted).

### 3.    Whitworth's Testimony

Whitworth gave the following testimony relevant to Ramirez's second issue:

A hematoma is essentially a blood clot, and it breaks down over time. The most common cause of subdural hematomas is through "significant trauma" such as an automobile accident or falling down stairs. Alternatively, chronic and subacute subdurals tend to form in elderly people from a much more minor incident or even spontaneously through no trauma at all. The elderly are more susceptible to subdural hematomas because of age-induced brain atrophy. Likewise, alcohol abuse can lead to subdural hematomas, because alcohol causes brain atrophy. Whitworth referred to a study finding that fifty percent of chronic subdurals are not caused by head trauma.

A hematoma caused by a head blow can form on either side of the brain regardless of which side of the head is struck. This lack of correlation occurs because the hematoma results from the brain's continuing to move after the head stops moving and potentially tearing a bridging vein that connects the brain to the dura. That is, "it doesn't matter which side the blow came from. It is just the fact that the head and brain are going to be moving at different rates and in different directions that's going to tear a vein somewhere." It is very difficult to almost impossible to

–16–

determine whether a trauma caused a subdural hematoma without a CT scan showing evidence of bleeding in the initial episode.

Subdural hematomas can be classified as acute, subacute, or chronic, according to the hematoma's age. When the diagnosing doctor doesn't know what specific event caused the hematoma and relies on radiographic imaging, a hematoma is considered "acute" when it is up to two weeks old, "subacute" when it is two to six weeks old, and "chronic" when it is more than a month old.

Hematomas generally break down by themselves over time and are in most cases reabsorbed into the body. Acute hematomas appear denser than adjacent brain tissue, subacute hematomas appear to have density similar to the adjacent brain tissue, and chronic hematomas appear less dense than the adjacent brain tissue. Thus, a hematoma's density can be determined by viewing a CT scan and visually comparing it to the adjacent brain matter. (The actual blood characteristics as it drains from the head during surgery can also be evidence of a hematoma's general age.)

Another way to measure a hematoma's density is to use computer software to measure how many "Hounsfield units" are present in the area of interest. Whitworth explained that Hounsfield units are measures of density and that "the Hounsfield units are most dense or most high the more acute the blood is."

Whitworth reviewed Ramirez's medical records, including his late November 2013 CT scans, and deposition transcripts for Ramirez, Welch, and Michael. Using the Hounsfield unit methodology, Whitworth determined that Ramirez's hematoma "was 35 to 40 Hounsfield units with the adjacent brain measuring 35 to 45 Hounsfield units."

Whitworth opined, based on his visualization of the clot's density in the CT scans and his Hounsfield unit measurement that Ramirez's subdural hematoma was subacute. He acknowledged

–17–

that it was "within the realm of possibility" that the September 8, 2013 incident caused the hematoma, but it was not probable, in reasonable medical probability. Rather, within a reasonable degree of medical probability, the hematoma was between two and six weeks old when Ramirez went to the emergency room on November 24, 2013.

Whitworth also said that he was not providing an opinion, within medical probability, about what caused Ramirez's subdural hematoma. He opined that the only way to establish a cause-and-effect relationship with the September 8, 2013 incident would be a CAT scan on that date showing that the hematoma started then.

Whitworth was also asked questions regarding Michael's testimony that (i) he saw "membranes" when he performed the surgery on Ramirez and (ii) such membranes are consistent with older hematomas and not recent ones. Whitworth disagreed, testifying that "[m]embranes can begin to form after one week."

### 4. Applying the Law to the Facts

#### a. Did the trial court abuse its discretion by admitting Whitworth's opinions that rely on Hounsfield units to establish the age of Ramirez's hematoma?

In addition to Michael's repeated references in Ramirez's medical records that the hematoma was subacute and his own visual observation from the CT scans, Whitworth also relied in part on his Hounsfield unit measurements to reach his opinion that Ramirez's hematoma was subacute and thus no more than six weeks old on November 24, 2013. Ramirez argues that this testimony was both conclusory and unreliable.

First, we reject the argument that Whitworth's testimony was conclusory. Whitworth explained that computer software can measure Hounsfield units in a specific area of a CT scan. He also explained that the Hounsfield units are the densest or highest "the more acute the blood is" and that hematomas break down and become less dense over time. Based on these explanations,

we hold that the trial court did not abuse its discretion by concluding that Whitworth adequately explained why and how Hounsfield units can be used to measure a hematoma's age.

We also reject Ramirez's reliability challenge. Ramirez argues that Welch did not show that using Hounsfield units was a reliable methodology for determining a hematoma's age. Specifically, Ramirez argues that the methodology (i) is not widely accepted in the field, (ii) is not supported by studies, publications, or peer review, and (iii) was criticized as "far from reliable" by an article that Whitworth otherwise relied on. He also argues that Whitworth did not produce any scientific literature to support his view that a measurement of twenty Hounsfield units indicates a chronic subdural hematoma.

However, there was evidence supporting some of the *Robinson* factors. Whitworth testified to his extensive neurosurgery experience, including being chief of neurosurgery at Parkland Hospital and being a neurosurgery professor at UT Southwestern. He has treated over 1,000 patients with subdural hematomas, and he commonly uses CT scans to diagnose such hematomas. Whitworth also testified that he was trained to use Hounsfield units in measuring a hematoma's density. He said it is not something he does regularly, because often no one is trying to determine when a trauma occurred, but he does it when he needs to.

Whitworth also testified that using computed tomography can be less reliable if certain factors are present in the patient, such as anemia, renal disease, or certain blood thinners. But he further testified that he thought that methodology was very reliable in this case.

Whitworth also addressed the part of the scientific article that suggested his methodology was not reliable. The full quotation from the article was this:

> However, repeated microhemorrhages into a chronic subdural hematoma can increase the density, giving rise to a heterogeneous or hyperdense picture. So classification of chronic subdural hematoma based on the appearance of computed tomography is far from reliable.

Whitworth disagreed that the second sentence of this quotation applied to Ramirez. He explained that (i) Ramirez's hematoma was homogeneous in appearance, not heterogeneous, and (ii) there was no evidence of an acute hemorrhage in the scan. Thus, he concluded that the caveat in the article did not apply to Ramirez. He further said that MRI imaging of a brain hemorrhage is not a controversial subject anymore.

Thus, there was evidence supporting some recognized reliability factors. First, Whitworth, an expert with fourteen years' experience in practicing neurosurgery, viewed Hounsfield unit measurement as a reliable way to assess the age of Ramirez's hematoma. *See Volkswagen of Am.*, 159 S.W.3d at 905 ("In some situations, the witness's skill and experience alone may provide a sufficient basis for the expert's opinion."). Second, he had been trained to use Hounsfield units to measure hematoma density, which suggests that the methodology has some acceptance in the scientific community. Third, Whitworth's training in the use of Hounsfield units to measure hematoma density also indicates that the methodology has medical (and thus non-judicial) uses.

Although Ramirez's lawyer referred to a sentence in an article indicating that Whitworth's methodology might be "far from reliable," Whitworth explained why that sentence was inapplicable based on the previous sentence in the article and the facts of this case.

Because there was some evidence that using Hounsfield units to measure a hematoma's age is a reliable methodology, we conclude that the trial court did not abuse its discretion by admitting Whitworth's opinion over Ramirez's objection.

b.    **Did the trial court abuse its discretion by admitting Whitworth's opinion that membranes form within a week after a subdural hematoma occurs?**

Whitworth testified that "[m]embranes can begin to form after one week" and "the membrane formation begins within the first week" after a subdural hematoma occurs. This testimony contradicted Michael's testimony that the membranes he saw during surgery suggested

–20–

an older hemorrhage. Ramirez argues that Whitworth's testimony was unreliable because it was unsupported by the scientific literature or objective scientific analysis. Ramirez points out that at his deposition Whitworth was unable to produce any literature supporting his opinion.

We reject Ramirez's argument. In *Gammill*, the supreme court observed that some expert opinions, like a beekeeper's opinion that bees take off into the wind, can be reliable based on nothing more than the expert's experience and observations of enough bees in enough circumstances. 972 S.W.2d at 726. Whitworth's membrane testimony is like that—a physician who treats enough subdural hematomas would be able to testify about their characteristics, such as how quickly membranes begin to form around them, based on his or her personal experience. Whitworth had practiced neurosurgery for fourteen years and had treated over 1,000 subdural hematoma patients by the time he testified. The trial court could reasonably conclude that Whitworth's opinion about membrane formation was sufficiently reliable to be admitted.

### c. Did the trial court abuse its discretion by admitting Whitworth's opinion that only a scan on September 8, 2013, could establish a causal relationship between the incident and Ramirez's hematoma?

Next Ramirez attacks Whitworth's opinion expressed at the end of the following exchange:

Q: Okay. You have agreed today that you would—you would make your opinions based upon reasonable medical probability.

A: Yes.

Q: And do you believe that it is possible to determine whether or not the incident of September 8th, 2013, caused Mr. Ramirez's subdural hematoma?

A: With the information that we have, I do not believe it is possible to determine whether that event caused the hematoma or not.

Q: What information would you need in order to make that opinion?

A: *The only way that I think you could establish a cause-and-effect relationship here is have had a CAT scan done on Mr. Ramirez September 8th, 2013.*

(Emphasis added.)  Ramirez argues that Whitworth's last answer is conclusory and unreliable because it is not well accepted in the field.  We disagree.

Whitworth opined that it was possible but not probable that the September 8th incident caused Ramirez's hematoma.  He further explained that he believed within a reasonable degree of medical probability that the hematoma was only two to six weeks old on November 24, 2013, based on Ramirez's CT scans and his other medical records including the operative reports, the progress notes, the consultations, the histories and the physicals.

Specifically, Whitworth testified that:

Q:      And what information would you need in order to make an opinion based upon reasonable medical probability as to what caused Mr. Ramirez's subdural hematoma?

A:      The main way that I would have to determine the cause of a chronic subdural hematoma would be for the patient to have a CAT scan on the date of the supposed injury.  If that CAT scan shows evidence of blood, and then six weeks later or eight weeks later the patient develops a chronic subdural hematoma, we've got the initial event documented on CT scan and the eventual outcome.

But barring proving that there was any bleeding during the initial episode, it is almost impossible to determine the causes of these subdural hematomas.

This testimony is consistent with the undisputed facts that (i) subdural hematomas degrade over time and are reabsorbed into the body; (ii) as they degrade, these hematomas' observable physical characteristics also change over time; and (iii) Ramirez fit the profile of a person for whom subdural hematomas can form spontaneously or from multiple causes.  Thus, the trial court could reasonably have concluded that it also sufficed to explain why Whitworth believed that contemporaneous evidence was necessary to show a probable causal connection between the September 8 incident and the hematoma.

Ramirez further argues that Whitworth's opinion was unreliable because Whitworth testified elsewhere that a *chronic* subdural hematoma would not appear on a CT scan on the date

of an incident. Thus, Ramirez implies, Whitworth contradicted himself by also saying that a CT scan on the date of an incident was the only way to draw a causal connection to a chronic subdural hematoma. But what Whitworth actually said was that (i) it usually takes weeks or months for a chronic subdural hematoma to become "clinically evident" and (ii) the patient wouldn't show chronic hematoma "signs and symptoms" on the date an incident happened. Because Whitworth didn't say that a CT scan wouldn't reveal an *acute* hematoma on the date an incident happened, he didn't contradict himself, and the premise of Ramirez's reliability challenge fails.

The trial court did not abuse its discretion by admitting Whitworth's testimony that a scan on September 8, 2013, would have been necessary to establish a causal connection by reasonable medical probability in this case.

### d. Did the trial court abuse its discretion by admitting Whitworth's testimony regarding the meanings of "subacute" and "chronic"?

Ramirez presents a one-sentence assertion, unsupported by legal authorities, that Whitworth's definitions of "subacute" and "chronic" were not reliable or "widely accepted in the medical field." This assertion is inadequately briefed. *See generally Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 895–96 (Tex. App.—Dallas 2010, no pet.) (discussing requirements for an adequate brief).

Ramirez's argument would fail on the merits in any event. Whitworth, a neurosurgeon with fourteen years' experience, head of neurosurgery at Parkland Hospital, and a neurosurgery professor at UT Southwestern, testified that the terms acute, subacute, and chronic have generally understood meanings in the field of neurosurgery. Then he defined the terms and used them throughout his testimony. The trial court could reasonably conclude that this testimony was sufficiently reliable. *See Gammill*, 972 S.W.2d at 726 ("Experience alone may provide a sufficient basis for an expert's testimony in some cases . . . .").

The trial court did not abuse its discretion by allowing Whitworth to testify about the meanings of the words "subacute" and "chronic."

> **e.** **Did the trial court abuse its discretion by admitting Whitworth's testimony because he could not exclude the September 8 incident as a possible cause of the hematoma?**

Next Ramirez argues that Whitworth's testimony suffered from an analytical gap because he could not exclude the possibility that the September 8 incident caused Ramirez's hematoma. We reject Ramirez's argument.

If evidence demonstrates that there are plausible causes of an injury other than the defendant's conduct that could be negated, the *plaintiff* must offer evidence excluding those causes with reasonable certainty. *See, e.g.*, *Bustamante*, 529 S.W.3d at 456. Ramirez extrapolates from this rule a more general principle that any causation expert must address and eliminate other potential causes of an injury, and he contends that Whitworth failed to do so.

Contrary to Ramirez's argument, we conclude that a *defense* expert can testify regarding possible causes of an injury. As the supreme court has said, "[e]xpert testimony concerning the possible causes of the condition in question will often assist the trier of fact in evaluating other evidence in the case." *Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 707 (Tex. 1970); *see also Farmers Tex. Cty. Mut. Ins. Co. v. Pagan*, 453 S.W.3d 454, 462 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("[A] defendant may introduce evidence—typically an expert opinion—regarding another 'plausible cause' of the plaintiff's injury . . . .").

Moreover, the plaintiff and the defendant are not in the same position as to proving causation. The plaintiff bears the burden of proof and so must adduce evidence that, more likely than not, the defendant's act or omission caused the plaintiff's injury. *See Gunn*, 2018 WL 2994534, at *5. The defendant, however, can prevail simply by persuading the factfinder that the plaintiff has not met his or her burden of proof. *See, e.g.*, *Bed, Bath & Beyond, Inc. v. Urista*, 211

S.W.3d 753, 757 (Tex. 2006) (noting that personal-injury defendant defended case principally by attacking plaintiff's credibility). Logically, a defendant can do this with evidence showing that the defendant's act or omission was not a probable cause of the injury, even without proving that any other actor or force was a probable cause of the injury. That was Welch's approach in this case: Whitworth testified that he could not say what, in reasonable medical probability, caused Ramirez's hemorrhage, but he could say that the September 8 incident, in reasonable medical probability, was not a cause because the hematoma was no more than six weeks old on November 24.

The trial court did not abuse its discretion by admitting Whitworth's testimony even though he could not identify a probable cause of Ramirez's injury.

### f. Has Ramirez otherwise shown error regarding the admission of Whitworth's testimony?

Ramirez concludes his arguments under issues one and two with a one-paragraph argument that the trial court committed "[c]umulative error" even if Ramirez's other arguments under his first and second issues fail. He asserts that the trial court's mid-trial ruling admitting Whitworth's testimony was error because (i) Ramirez could not voir dire the jury about Whitworth, (ii) Ramirez could not address Whitworth's testimony during his opening statement or case in chief, (iii) Whitworth's testimony was not limited to rebutting Michael's testimony, and (iv) Ramirez's objections to form, leading, and responsiveness should have been sustained.

Ramirez includes no record references or citations to authority in his cumulative error argument. Accordingly, this argument presents nothing for our review. *See Bolling*, 315 S.W.3d at 896.

We overrule Ramirez's second issue.

## C.     Third Issue:  Did the trial court commit jury charge error?

Ramirez's third issue argues that the trial court committed jury charge error in the instructions accompanying the damages question.  Specifically, Ramirez argues that the trial court erred by overruling his objections to the two emphasized paragraphs below:

### QUESTION 3

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate RAUL RAMIREZ for his injuries, if any[,] that resulted from the occurrence in question?

Consider the elements of damages listed below and none other.  Consider each element separately.  Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss.  That is, do not compensate twice for the same loss, if any.  Do not include interest on any amount of damages you find.

**Do not include any amount for any condition existing before the occurrence in question, except to the extent, if any, that such other condition was aggravated by any injuries that resulted from the occurrence in question.**

**Do not include any amount for any condition arising after the occurrence in question, except to the extent, if any, that such other condition was aggravated by any injuries that resulted from the occurrence in question.**

Do not include any amount for any condition that did not result from the occurrence in question.

(Emphasis added.)

Ramirez objected that the emphasized instructions were unsupported by the pleadings or the evidence.  On appeal, Ramirez attempts to raise additional objections to these instructions, specifically that (i) they were comments on the weight of the evidence and (ii) the second emphasized paragraph (about subsequent conditions) incorrectly stated the law.

Appellate jury charge complaints must comport with the objections made in the trial court. *Wal-Mart Stores Tex., LLC v. Bishop*, No. 05-16-00749-CV, 2018 WL 3031776, at *15 (Tex. App.—Dallas June 19, 2018, pet. filed) (mem. op.).  If the appellate complaint does not match the

trial court objection, the complaint is not preserved for review. *Id.* Accordingly, we address only Ramirez's complaint that the instructions were unsupported by the pleadings or the evidence.

We review a trial judge's decision to submit a jury instruction for abuse of discretion. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). An instruction is improper if it does not find support in the pleadings and evidence. *See id.* A trial court has more discretion when submitting instructions than when submitting questions. *Curtis v. AGF Spring Creek/Coit II, Ltd.*, 410 S.W.3d 511, 514 (Tex. App.—Dallas 2013, no pet.). Charge error is harmful if it probably caused an improper judgment or probably prevented the appellant from properly presenting its case to the appellate court. *Thota*, 366 S.W.3d at 687. Charge error is generally considered harmful if it relates to a contested, critical issue. *Id.*

Ramirez makes no argument about the pleadings' sufficiency, so we focus solely on whether there was some evidence to support the challenged instructions.

The first challenged instruction told the jury not to award Ramirez any damages for any condition that existed before the September 8th incident, except to the extent the condition was aggravated by injuries resulting from the incident. Was there some evidence that Ramirez suffered from a pre-existing condition that the incident could have aggravated? The trial court could reasonably have concluded that there was.

Specifically, Whitworth testified that advancing age and chronic alcohol use both cause brain atrophy or shrinkage, which puts tension on adjacent blood vessels and can make them fragile and likely to break. As to age, he said that the greatest incidence of chronic subdural hematomas occurs in the "sixth and seventh decades of life." Medical records showed that Ramirez was 64 at the time of the incident, and Whitworth testified that the records also noted chronic alcohol abuse. Thus, there was evidence to support the premise that Ramirez had health conditions before the

incident in question that the September 8th incident could have aggravated, and the trial court did not abuse its discretion by submitting the pre-existing condition instruction.

Next, the second challenged instruction told the jury not to award Ramirez any damages for any condition that arose after the September 8th incident, except to the extent "such other" condition was aggravated by injuries resulting from the incident. To aggravate means to make worse. *See Aggravate*, THE NEW OXFORD AMERICAN DICTIONARY (2001) ("make (a problem, injury, or offense) worse or more serious"). Thus, this instruction told the jury that it could include in its award damages to the extent that the occurrence in question, the September 8th altercation, made worse a different condition, other than the condition that the blow caused, that came about subsequently.

Nobody testified that the head-blow in fact made worse a different condition that in fact arose after that occurrence. But there was evidence that Ramirez's age and alcohol profile were consistent with one who was more likely than the general population to develop a subdural hematoma anyway. Thus, this instruction told the jury that they could award damages if they found that the head-blow made worse a smaller hematoma that they believed was likely to occur anyway.

Moreover, even if the instruction was unsupported by the evidence, any error in submitting it was harmless. Error is harmful if it probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case to the appellate court. TEX. R. APP. P. 44.1(a). Here, reviewing the entire record and the jury charge as a whole, *see European Crossroads' Shopping Ctr., Ltd. v. Criswell*, 910 S.W.2d 45, 54 (Tex. App.—Dallas 1995, writ denied), we conclude that this single instruction did not probably cause an improper judgment, that is, cause the jury not to award damages that they otherwise would have awarded. The instruction

was a minor part of a lengthy instruction about damages, and neither side mentioned it during closing argument.

Finally, an erroneous instruction may be harmless error if it benefits the complaining party. *See, e.g.*, *Mo., K. & T. Ry. Co. of Tex. v. Gillenwater*, 146 S.W. 589, 591 (Tex. Civ. App.—Dallas 1912, writ ref'd) (defendant was not harmed by jury charge that placed too great a burden on the plaintiff). Here, this instruction actually benefited Ramirez. Read as a whole, the instruction told the jury that they could award damages for a condition that arose after the head-blow when they might otherwise be disinclined to do so.

Accordingly, we hold that submitting this instruction was not reversible error. Accordingly, we overrule Ramirez's third issue.

## D. Fourth Issue: Did Welch's lawyer make an improper and incurable closing argument?

Ramirez's fourth issue argues that Welch's lawyer made an improper and incurable closing argument. He preserved error by raising the point in his new trial motion. *See Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009) ("[I]ncurable argument may be asserted and preserved in a motion for new trial . . . ."). We review the denial of a new trial motion for abuse of discretion. *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009) (per curiam).

Incurable jury argument is rare. *Phillips*, 288 S.W.3d at 883. The party claiming incurable harm must show that, based on the entire record, the offensive argument was so extreme that the argument could have persuaded an ordinarily intelligent juror to agree to a verdict contrary to the one he or she would have agreed to absent the argument. *Id*.

And to show that the argument was incurable, the appellant must show that the argument, by its nature, degree, and extent, was so improper that a court instruction or retraction by counsel could not have removed its effects. *Wilhoite v. Sims*, 401 S.W.3d 752, 763 (Tex. App.—Dallas 2013, no pet.).

Recognized examples of incurable arguments include (i) appeals to racial prejudice, (ii) inflammatory epithets such as "liar," "fraud, "faker," "cheat," and "imposter," and (iii) unsupported charges of perjury and witness tampering. *Id.*

Ramirez complains about the emphasized passage within the following argument excerpt:

> These are some of the questions you heard Mr. Burkhead ask Mr. Ramirez—excuse me, ask Mr. Welch and other people during this trial. Little old ladies, people with baby carriages, people who might be visiting from out of town, the rules are there to protect all those people. Is that fair?

> Okay. Do you agree that good rules can protect all of us in a community? And without rules, we'd have chaos, carnage throughout our community. I challenge you, go through these instructions that the judge handed you. Where do you find that?

> **What he is trying to do is, it is a plaintiff's lawyer's trick called the reptile theory. The thought is that there is a part of your brain that is similar to a reptile's brain, and that he is trying to get the fight-or-flight experience going for you so that you are scared, so you are thinking about community. It's kind of offensive, but that's what's going on. That's why those questions are being asked**.

> They weren't asked just of Mr. Welch. If you remember, they were asked of the police officers. They were asked of doctors. That's not what you are here for today. You are here to follow the law, the law that's been given to you by Judge Goldstein.

Ramirez complains that this argument personally attacked Ramirez's lawyer and accused him of trying to psychologically manipulate the jury.

We find no abuse of discretion. The argument was not one courts have recognized as incurable. *See id.* Moreover, the argument addressed a question Ramirez's lawyer had asked during the trial. Specifically, Ramirez's lawyer asked Welch a question about whether safety rules are meant to protect "[l]ittle old ladies, people with baby carriages, [and] people who might be visiting from out of town." Thus, the closing argument was a comment on something Ramirez's lawyer said rather than an unsupported accusation of wrongdoing. Finally, the argument was not so extreme or extended that a court instruction or retraction by counsel could not have removed

any improper effect. The trial court could reasonably conclude that Welch did not make an incurable jury argument.

We overrule Ramirez's fourth issue.

**E.      Fifth Issue: Did the trial court err by excluding certain causation testimony by Michael?**

Ramirez's last issue argues that the trial court erred by excluding some of Michael's deposition testimony. According to Ramirez, the court excluded testimony explaining how Ramirez's medical records were consistent with Ramirez's proximate cause theory. Welch responds that the trial court admitted ample causation testimony from Michael and that Ramirez has inadequately briefed this issue.

We agree with Welch that Ramirez introduced ample causation testimony from Michael and has not shown how omitting any additional Michael testimony probably led to the rendition of an improper judgment.[10] *See* TEX. R. APP. P. 44.1(a)(1).

We therefore overrule Ramirez's fifth issue.

## IV.  CONCLUSION

Having overruled Ramirez's five issues, we affirm the trial court's judgment.

/Bill Whitehill/
_____
BILL WHITEHILL
JUSTICE

160681F.P05

---

[10] Ramirez does not identify any specific testimony that the trial court erroneously excluded and cites no supporting legal authorities. He instead cites his offer of proof, which was Michael's entire deposition transcript. Ramirez had to (i) identify the specific testimony that he claims was erroneously excluded and (ii) explain the error with appropriate citations to legal authority.

–31–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RAUL NANEZ RAMIREZ, Appellant

No. 05-16-00681-CV      V.

EZRA CLIFTON WELCH, Appellee

On Appeal from the 44th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-14-01851.
Opinion delivered by Justice Whitehill.
Justices Francis and Myers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Ezra Clifton Welch recover his costs of this appeal from appellant Raul Nanez Ramirez.

Judgment entered this 6th day of August, 2018.